Filed 1/5/15  Marriage of Montague CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re Marriage of JUDY K. and DARRELL K. MONTAGUE. | |
| JUDY K. MONTAGUE,<br><br>    Respondent,<br><br>        v.<br><br>LORI D. ERVIN,<br><br>    Claimant and Appellant. | G049487<br><br>(Super. Ct. No. D340076)<br><br>O P I N I O N |

Appeal from an order of the Superior Court of Orange County, Glenn R. Salter, Judge.  Affirmed.

Russakow, Greene & Tan and Colin T. Greene for Claimant and Appellant.

Stephen Temko and Dennis Temko for Respondent.

\*          \*          \*

## I.  INTRODUCTION

When Darrell and Judy Montague got divorced in 1993, they had two young children, ages five and three, and a house in Westminster worth $16,000 less than what they had paid for it.  The primary residence of the two children was to be with their mother, Judy.  So the couple made a deal, embodied in a stipulation for judgment, with regard to the disposition of the Westminster house:  They would list it with a mutually-agreeable realtor, and if the house sold within 90 days they would divide the net proceeds equally.  But if the house didn't sell within 90 days, the *entirety* of the "right, title and interest" in the property would go to Judy.  Meanwhile, Judy would have to keep up all mortgage, tax and insurance payments.

As the trial court would find some 20 years later in the hearing giving rise to this appeal, Darrell prevented the sale by the expedient of simply not signing the necessary paperwork.  As a result, the house was never sold.  Judy stayed, made all the payments, and all equity in the house today is the direct result of her payments.  Darrell, however, was still on the title, so he gave his "50 percent interest" – or at least what he may have *thought* was his 50 percent interest – in the property to his second wife, Lori Ervin, when they divorced in 2011.  Then Lori contacted Judy, hoping to have Judy buy her out of Darrell's ostensible 50 percent interest in the property.  In response, Judy filed a request to have the court both (a) set aside Darrell's transfer and (b) award the entirety of the property to Judy.  The trial court granted both requests.  Lori now appeals from the ensuing order, arguing that any award of the entirety of the property to Judy depended on the condition precedent of a preliminary listing of the property for sale for 90 days, which condition precedent was never fulfilled.

We disagree.  The trial court correctly divined the essence of the parties' agreement.  Everything was supposed to be wrapped up, one way or the other, in 90 days.  *Either* Judy would be awarded the house in its entirety *or* there would be a miracle in which the house would be sold to a third party with net – positive – proceeds in which

2

Darrell could share. Darrell chose to preempt even the possibility of that miracle, meaning the award to Judy was the only possible outcome. Given Darrell's non-cooperation in the sale, the trial court merely did in 2013 what it had the power to do in the latter part of 1993 or early 1994 – declare the house entirely Judy's.

## II. FACTS

As part of their divorce, Darrell and Judy entered into a stipulation for partial judgment on reserved issues, filed July 1993. The document incorporated, as part of its terms, a recommendation from a family counseling center involving visitation and custody of the couple's two children, one of the provisions of which was that the "primary residence" of the children was to be with Judy. The couple had purchased a home in Westminster in 1988, but by 1993 it was worth $16,000 less than what they had paid.

No less than seven paragraphs of the agreement were devoted to setting out a step-by-step process to control the disposition of the Westminster property. That process may be described as follows:

(1) The house was to be listed "immediately" with a licensed broker.

(2) The broker was to be "mutually designated by the parties."

(3) The listing was to last only 90 days from the July 1993 judgment.

(4) The broker would have to agree that if one of the parties bought out the other, the broker wouldn't get any commission.

(5) The parties were to cooperate fully to perform all acts necessary to facilitate listing and sale of the property.[1]

---

[1] These first five steps are all found in the first paragraph governing the house, which we provide here verbatim:

"11. The family residence located at 13571 La Pat Place, Westminster, California shall be listed immediately for sale with a licensed real estate broker to be mutually designated by the parties for a term of 90 days from the date of entry of this judgment or the execution of the listing agreement, whichever is later. The brokerage agreement shall exclude from treatment as a sale entitling the broker to a commission any transfer or sale between the parties. The parties shall cooperate fully and reasonably in performing all acts necessary to facilitate the listing and sale of the property as quickly as practicable."

3

(6)  If the broker came up with a "bona fide offer" from a "qualified third party purchaser," either spouse could buy out the other for the net amount the other would receive from that buyer, with Judy having the right to go first.[2]

(7)  And if one of the parties did elect to buy out the other, but failed to complete the purchase, he or she would forfeit any deposit to the other.[3]

(8)  But if no purchaser was found, all "right, title and interest" in the property was to be "awarded" to Judy, with Darrell obligated to give Judy an interspousal transfer deed to effectuate that award.[4]

(9)  Meanwhile, Judy was to make all mortgage, tax, maintenance and insurance payments during the period of her "exclusive occupancy" of the residence prior to its sale.[5]

(10)  In the event the property was indeed sold to a third party, the proceeds would be divided equally, but Darrell would receive credit for making any missed payments Judy was supposed to have made.[6]

---

[2]  This step is set out in the next paragraph, which read: "12. During the term of the listing, in the event that a bona fide offer of cash purchase is made by a qualified third-party purchaser, either party may purchase from the other the residence by offering to forthwith pay to the other the amount such party would receive through close of escrow under the terms of the third-party offer, with Petitioner enjoying the first right of refusal, and Respondent thereafter enjoying the second right of refusal."

[3]  "13. In the event either party exercises such option, he or she shall forth deposit into an escrow account an amount equal to not less than one half of the buy-out price, and shall complete the funding of escrow by no later than the sale closing date contained in the third-party sale. In the event that either party, after having elected to buy the other party's interest and paid the initial deposit into escrow, fails to complete the purchase or timely close escrow, he or she [shall] be deemed to have forfeited such deposit to the other and shall so instruct the escrow holder."

[4]  "14. If neither party elects to exercise his or her right of refusal, the property shall be sold to the third-party in accordance with the terms and conditions of that party's offer. If, upon the expiration of the 90-day term of the listing agreement, no bona fide offer has been made by a third party for the purchase of the residence, then thereafter all right, title and interest therein shall be awarded to Petitioner, and Respondent shall execute, acknowledge and deliver to Petitioner, in a form acceptable to her attorney, an interspousal transfer deed."

[5]  The agreement obviously recognized Judy's possession of the residence at the time of the agreement: "15. During Petitioner's exclusive occupancy of the residence before its sale, she shall be solely responsible for payment of the encumbrances and property taxes and for maintenance and payment of the existing property insurance, and will hold Respondent harmless from each liability. If Petitioner fails to timely make any payment, Respondent may do so and will be entitled to recover from Petitioner's share of the sale proceeds the amount paid, with interest at the rate of 10 percent per annum from the date of payment."

4

(11) The trial court would retain jurisdiction to make orders relating to the "sale of the family residence" in the event "the parties" did not cooperate with regard to the "sale process itself, provisions regarding the residence pending sale, disposition of proceeds, and tax consequences."[7]

The trial court made specific findings of fact as to the parties' post-contract conduct. None are challenged on appeal for lack of substantial evidence to support them. The property was, in 1993, upside down – that is, there was no equity in it.[8] Even so, Judy made good faith efforts to list the house, including finding a realtor and making a change in the listing agreement at Darrell's behest, and sent the revised paperwork to Darrell's attorney, but even then Darrell refused to sign it. Darrell's factual claim that the two had an oral agreement to let Judy stay in the house until the children came of majority was specifically rejected by the trial court. The trial court also specifically found Darrell had breached the agreement.

There is no dispute the property was never listed, and Judy continued to live in the house and make all the payments. There is also no dispute as to the events leading to the hearing: Darrell married Lori Ervin in 2004, separated from her in 2009, and in December 2011 the two came to a marital settlement agreement, incorporated into a stipulated judgment, which included the transfer to Lori of "50 percent interest of real estate" in the Westminster home. Lori subsequently contacted Judy, asserting her interest

---

[6] "16. On sale of the residence to a third party, the proceeds remaining after payment of all encumbrances, any adjustments required by the immediately succeeding paragraph, and payment of reasonable costs of sale will be divided equally between the parties. If Petitioner fails to pay any obligation set forth in the [p]receding paragraph, Respondent, at his option, may require that this failure be remedied out of Petitioner's share of the proceeds before their division between the parties."

[7] "17. The Court reserves jurisdiction to make such orders relating to sale of the family residence that are necessary to carry out this judgment if the parties fail to cooperate or agree, including orders with respect to the sale process itself, provisions regarding the residence pending sale, disposition of proceeds, and tax consequences."

[8] This is a reasonable inference from Judy's declaration that the house was worth $16,000 less than what the couple had paid for it when they bought it, combined with evidence of "comparables" from 1994 that showed values of two houses with the "same tract, same size and same condition" going for as low as $152,000 and $140,000 . In any event, Lori has not challenged on appeal the trial court's implied finding there was no equity in the house back in 1994.

5

in the house, basically asking to be bought out of her newly-acquired 50 percent interest. Judy responded by filing a motion in her original divorce case (hence the now antiquated superior court docket number D340076) seeking orders to set aside Darrell's transfer to Lori and declare the property awarded to her. The trial court filed a formal order on November 6, 2013, stating the property "is vested solely" in Judy and declaring Lori "has no interest in the property." Lori timely appealed from that order.

## III. DISCUSSION

Lori's main argument focuses on the issue of condition precedent. She reasons that, under the literal terms of the contract, listing the property for sale with a mutually-agreeable agent and the subsequent failure to find a third-party buyer were absolute conditions precedent to Judy's receiving all interest in the property. Since there was no listing or sale, there was never an event that actually transferred Darrell's 50 percent interest to Judy, ergo Darrell retained his initial 50 percent interest in the house and could later assign it to Lori.

Lori's argument is effectively refuted by case law that holds a party who *prevents* a condition precedent by his or her own wrongdoing cannot later take advantage of the absence of that condition. (See generally 1 Witkin, Summary of Cal. Law (10th ed. 2005) Contracts, § 821, pp. 910-911 ["A person cannot take advantage of his or her own act or omission to escape liability; if the person *prevents or makes impossible* the performance or happening of a condition precedent, the condition is excused."].)

Two California Supreme Court cases clearly establish that point, and under circumstances involving conduct *less* egregious than Darrell's here. First is *Pacific Venture Corp. v. Huey* (1940) 15 Cal.2d 711. There, a seller sold mining claims in Arizona. The terms of the sale were $1,891.90 up front, with another $2,500 to be paid from two specific sources: (1) royalties from the claims themselves, or, (2) if the claims were sold before the royalties yielded $2,500, from the proceeds of any sale, which would be due on the final payment of those proceeds. (*Id.* at pp. 712-713.) But the

6

buyers got clever. They contrived to exchange their mining claims with a third party for his equities in an apartment house, with the third party agreeing to be the person obligated to pay the seller the $2,500. (See *id.* at pp. 713-714.) When the seller didn't get his $2,500 upon the consummation of the apartment house deal and sued the buyers (as well as the third party), the buyers argued they had no liability because "neither source" of the money had "materialized prior to the filing of plaintiff's complaint," so the condition precedent of paying that $2,500 hadn't been fulfilled. The trial court felt constrained to agree. (See *id.* at pp. 714-716.) The Supreme Court, however, rather emphatically did not. The high court pointed out that the buyers were, in effect, trying to avoid their liability to pay the $2,500 because of their own voluntary act, and contract law just doesn't allow such an easy evasion of one's performance. (*Id.* at pp. 716-717.)[9]

The other high court case is *Bewick v. Mecham* (1945) 26 Cal.2d 92, which presents facts analogous to the case before us – both cases involve processes of valuation requiring the contracting parties to cooperate with each other as a condition precedent of a given outcome. In *Bewick*, a would-be gas station operator undertook to lease some property for use as a gas station, with the lease placing on him the obligation to do the necessary building and other improvements. There was also a provision in the lease allowing him to buy the land at the expiration of the lease based on a price to be either mutually determined or, if the parties couldn't agree, by arbitration, with each side picking one arbitrator and those two arbitrators picking the third. The operator spent considerable money on improvements and, when the lease was up, sought to buy the property. The reason there was a lawsuit is that the lessor refused to sell and – shades of Darrell's refusal to do the paperwork here – refused to appoint his own arbitrator. The operator brought an action for specific performance, asking the court (as distinct from

---

9    The case articulated a clear statement of the rule: "It appears to be well settled that a person cannot avoid liability for the nonperformance of an obligation by placing such performance beyond his control by his own voluntary act." (*Pacific Venture, supra*, 15 Cal.2d at p. 717.)

7

arbitrators) to establish the price. The court did indeed establish a price and ordered the lessor to sell at that price. The lessor then appealed, but the Supreme Court affirmed. (*Id*. at pp. 94-95.)

As here, in *Bewick* one of the lessor's arguments on appeal was the absence of the condition precedent of an arbitration which, by the contract's literal terms, was necessary before there could be any forced sale. The *Bewick* court countered by noting the absence of the fulfillment of the condition precedent was the direct result of the lessor's own doing. And, as in *Pacific Venture*, the rule against sabotaging your own obligation again prevailed. Said the court: a "party who prevents fulfillment of a condition of his own obligation commits a breach of contract [citations] and cannot rely on such condition to defeat his liability." (*Bewick, supra*, 26 Cal.2d at p. 99.)

Lori also alludes to the well-establish reluctance of courts to construe ambiguous contracts to result in forfeitures. (E.g., *Ballard v. MacCallum* (1940) 15 Cal.2d 439, 444 ["the policy and rule are settled, both in the interpretation of ordinary contracts and instruments transferring property, that the construction which avoids forfeiture must be made if it is at all possible"].) In its best possible light, Lori's argument is that the 1993 Judy-Darrell agreement contained an obvious ambiguity: What would happen if the parties couldn't agree on a realtor or listing terms? Given that ambiguity, says Lori, the contract should not be interpreted in a way that strips Darrell of the 50 percent interest he had going into it.

Except here there really is no forfeiture *as to Darrell*. Contracts may be explained by the surrounding circumstances that gave rise to them. (See Civ. Code, § 1647 ["A contract may be explained by reference to the circumstances under which it was made, and the matter to which it relates."].) There is no dispute that the property had no equity in it at the time of the contract, and would have been totally lost if Judy had not made the necessary payments on it. So what Darrell agreed to do was to "forego" his

negative $8,000 interest in the property and allow Judy to take the house and the $16,000 financial hole in which it was located. We cannot see that as a forfeiture.

Indeed, on close examination, the forfeiture argument poses a formidable reason to *reject* Lori's (really Darrell's) proffered interpretation of the contract, because that interpretation would result in a real forfeiture *to Judy*. Under the Lori-Darrell interpretation, Darrell supposedly would have had the unilateral power to prevent the property being awarded entirely to Judy simply by not signing the necessary paperwork, sit back and let Judy make all payments for the better part of two decades, then come forward to claim half of the equity for which Judy was 100 percent responsible. Such an interpretation amounts to nothing less than Darrell arrogating to himself *an option* to sell the property at a future time. Such an option is utterly in opposition to the basic structure of the agreement, which was to have the house disposed of, one way or the other, within a little more than 90 days from July 1993. Lori's dispute should not be with Judy, but with Darrell.

## V. DISPOSITION

The order is affirmed. Judy shall recover her costs on appeal.


BEDSWORTH, J.

WE CONCUR:


RYLAARSDAM, ACTING P. J.


FYBEL, J.

9